NORTHRUP *v.* NORTHRUP.

DIVORCE—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.

On appeal from a decree dismissing the husband's bill for divorce, evidence on the part of plaintiff that defendant's constant nagging, scolding, and fault-finding rendered it impossible for them to live together, although plaintiff was not entirely without fault, *held*, sufficient to make out a case of extreme cruelty requiring reversal of the decree of the court below and one entered granting divorce.

Appeal from Wayne; North, J., presiding. Submitted January 10 1918. (Docket No. 44.) Decided March 27, 1918.

Bill by LeRoy Northrup against Cora May Northrup for a divorce. From a decree dismissing the bill,

plaintiff appeals. Reversed, and decree entered for plaintiff.

*Welsh, De Foe & Kahn,* for plaintiff.

*James J. Noon,* for defendant.

OSTRANDER, C. J. This cause was heard in April, 1916. At that time the plaintiff was 36 years of age. The parties were married in 1904, and lived together until 1914. In the ten years of cohabitation there have been three children born, but one of whom, the first born, a hopelessly deformed and physically deficient, but mentally bright, daughter, a great care, is living. The plaintiff charges his wife with extreme cruelty. Acts of physical violence are charged and the testimony for plaintiff, particularly his own testimony, tends to prove that the defendant, upon occasions, employed her hands and feet upon him in inflicting personal injury, and her tongue in vilifying and abasing him and his father. On the other hand, defendant, who denies the charges of cruelty, and who seeks no relief from the marriage contract, claims that she has been obliged to defend herself, by force, from threats and from attempts of plaintiff to strike her—to slap her. An analysis of the testimony shows that whatever either party did personally, to the other, was as a rule the result of disagreements, the climax of wordy disputes. Both are reputable; the plaintiff a hard-working man, of good habits, home-loving, economical, the defendant a good housekeeper, clean and capable in a housewifely way. They had a good home, well furnished, convenient. Help, when it was needed, defendant always had. From a material standpoint, they should have prospered, as they did for a time, should have accumulated a competence, and in the course of time have been able to dismiss anxiety for the future. Their trouble, primarily, seems to be one

of mismating; secondarily, the inability of one or both of them to compromise and to adjust differences—to adapt themselves to each other. As I have said, the physical encounters were usually, if not always, the conclusion, the result, of wordy wars. Plaintiff contends that defendant's conduct, "Nagging, fault-finding, scolding, pestering the life out of me," as he puts it, with no prospect of ultimate peace, resulted finally in reducing him to a state in which he could not go on, effectively, with his business, lost his ambition, and seriously affected his health. He claims to have been fairly driven from his home by her, unable there to escape her petulant persecution, day or night. He left home once, in the night, going to a hotel for rest. He left home, finally, taking a journey of some length and a rest of some duration. Judgments were taken against him and property he owned was sold to satisfy creditors, or those he claims were creditors. He is blamed for this by counsel for defendant. That he might have avoided this, might have gone on accumulating, paid his debts, saved his property, I have no doubt, if his courage and ambition had continued.

Some excerpts from defendant's testimony throw light upon the situation:

"*Q.* Now, on the occasion this tea-cup was thrown, you said Mr. Northrup came around the table to slap you, he was going to, but he didn't?

"*A.* He did.

"*Q.* He did slap you that time?

"*A.* Yes, he did.

"*Q.* And did he slap you with his open hand?

"*A.* Yes, sir.

"*Q.* Where did it strike you?

"*A.* Well, on the face, I don't remember particularly.

"*Q.* On which side?

"*A.* I don't remember.

"*Q.* Did he leave any marks?

"*A.* No.

"*Q.* Did you throw the cup afterwards or before he started?

"*A.* As I think it over, he went back and sat down at his place and I picked up the cup, and as I picked it up the tea went back on the wall; I threw the cup and it broke on the radiator.

"*Q.* The cup broke back of where you were sitting?

"*A.* Yes, sir.

"*Q.* So the cup struck over his chair and not over yours?

"*A.* I don't know whether it struck the chair or not.

"*Q.* Over the chair, on the wall back of the chair?

"*A.* It didn't strike on the wall, it struck the radiator; there is no wall; the window is over the radiator.

"*Q.* Where was the radiator, back of Mr. Northrup's chair?

"*A.* Yes, sir.

"*Q.* You threw the cup after he slapped you?

"*A.* Yes, sir.

"*Q.* What led up to that, do you recall?

"*A.* I don't remember.

"*Q.* He had gone back and sat down?

"*A.* Yes, sir.

"*Q.* And some time elapsed before you threw the cup at him?

"*A.* No, as soon as he sat down I picked up the tea and threw it at him.

"*Q.* Now, at the time of this accident when you cut your arm, he was going to strike you on that occasion?

"*A.* Yes, sir.

"*Q.* He didn't strike you?

"*A.* No, he didn't. * * *

"*Q.* Now, you said when you lived with Mr. Northrup's parents he slapped you at other times with his open hand?

"*A.* Yes, sir.

"*Q.* Can you recall any specific occasion?

"*A.* No, I can't.

"*Q.* How were those blows, did he push you with his open hand or leave his hand flat?

"*A.* No, he walked right up to me and slapped me.

"*Q.* Without any provocation?

"*A.* Well, I presume we were probably having words.

"*Q.* Well, did he strike you hard?

"*A.* Yes, he struck me hard.

"*Q.* Leave any marks?

"*A.* No.

"*Q.* Did you speak to him about it at the time?

"*A.* No, I didn't.

"*Q.* Was any one ever present when he struck you?

"*A.* No one but the children.

"*Q.* Who was present?

"*A.* A small cousin of Roy's once.

"*Q.* Who was that?

"*A.* Madeline Thomas.

"*Q.* When was that?

"*A.* Oh, I couldn't tell you when it was; it was perhaps a year before Roy went away.

"*Q.* Well, did you speak to any one about that?

"*A.* No, I didn't.

"*Q.* Well, now, do you remember any other occasion?

"*A.* Not anything in particular; he slapped me a number of times.

"*Q.* Do you recall an occasion where he took hold of your hands and arms and held you on the floor during one of these times when you were having words?

"*A.* No, I do not.

"*Q.* Well, did he ever do that?

"*A.* Not that I remember.

"*Q.* He never held your arms?

"*A.* He has taken hold of my arms and taken hold of my wrists hard; he would be angry. I never went to Mr. Northrup; he came to me.

"*Q.* He took hold of your hands on several occasions and held them tightly?

"*A.* Yes, he did.

"*Q.* Why did he do that?

"*A.* Because he was angry.

"*Q.* Is that all?

"*A.* Why, yes; he was angry.

"*Q.* Were you angry, too?

"*A.* I perhaps wasn't very good-natured, any more than he.

"*Q.* And you have taken him by the ears on one occasion?

"*A.* Yes, sir; the day he went away.

"*Q.* And that was in the morning before he was dressed?

"*A.* Yes, sir.

"*Q.* While he was dressing?

"*A.* Yes, sir.

"*Q.* And you had bitten him on the arm once?

"*A.* I think I bit him; it was because perhaps he was abusing me.

"*Q.* But you have bitten him on the arm?

"*A.* But not enough to hurt him.

"*Q.* But you bit him?

"*A.* I attempted to in self-defense.

"*Q.* And another time you attempted to strike him with a fork?

"*A.* In self-defense.

"*Q.* He had noticed that you would strike him or bite him or something like that?

"*A.* I never offered to.

"*Q.* But he knew you had done these things, and isn't it a fact he took hold of your arm and hands to stop you from doing any damage?

"*A.* No; he would take hold of my arms and hands and he would pinch very hard.

"*Q.* On those occasions would he strike you?

"*A.* It is likely he would strike me.

"*Q.* Isn't it likely you would keep those things in mind?

"*A.* No, I tried to forget those things.

"*Q.* Can't you fix the time, Mrs. Northrup, when any of these occasions happened—they must stand out in your mind with a certain amount of distinction?

"*A.* Well, I can't tell you any certain instance, but I remember every time and very often when I would approach Roy to ask him about affairs, which I thought I had a right to understand and know, he would say 'what difference does it make?' and I would say, 'I think I have a right to know.'

"*Q.* What were those things?

"*A.* Property affairs and about his business that I really should know, and he says, 'Well, all you want to do is quarrel, you just want to pick a quarrel,' and I would say, 'Roy, you know better, that is only right, you know I should know it,' and he would spring at me and he ran clear out of his office and slapped me in the face if I would insist on knowing.

"*Q.* If you would insist on knowing?

"*A.* Yes, sir.

"*Q.* You became very firm in your manner of insisting?

"*A.* After I had been refused and refused.

"*Q.* How would you insist on knowing these things —what did you say to him?

"*A.* I would say, 'Roy, won't you please tell me about things' I wanted to know about, about what he took in when they were in business, and all he wanted me to know was the $10 or $15 he handed to me in an envelope, and when I would want to know he would say, 'You want to quarrel, but it isn't any of your business,' and I would say, 'No, I don't want to quarrel, Roy,' and he would say, 'Oh, yes, you do, you just want to quarrel,' and so I would drop it; I would think, I will wait, and at another time I will approach him again kindly, and I would ask him; he would again tell me I wanted a quarrel and I would drop it.

"*Q.* When would you insist on having this information?

"*A.* When I continued to keep asking him, I would ask him at night, and these are the occasions when he speaks of my renewing the same.

"*Q.* These are the occasions that continued over a long course of time?

"*A.* Yes, because he wouldn't give me any satisfaction whatever.

"*Q.* And those are the times when he would become angry and strike you?

"*A.* Yes, sir.

"*Q.* Well, you can't remember any definite one?

"*A.* No, not any definite one; every time I would ask him.

"*Q.* When he would come to you and hold your hand, would he stand close to you or at arm's length?

"*A.* He would come and grab hold of my wrists, shake me.

"*Q.* Would he stand off at a distance or close to you?

"*A.* Well, naturally as any one would stand under the circumstances.

"*Q.* Did he stand close to you or at arm's length?

"*A.* Well, I couldn't tell you exactly, like that.

"*Q.* You kicked him on occasions?

"*A.* When he was abusing me; yes.

"*Q.* You kicked him in the shins?

"*A.* Yes, sir.

"*Q.* And you also kicked him in the abdomen?

"*A.* Well, I don't know.

"*Q.* Well, you tried to?

"*A.* Because he was abusing me, I tried to in self-defense, as I told you before; I never approached Roy only in self-defense; I never offered to touch him only as he came at me.

"*Q.* You tried to kick him in a part of the body which, if you were successful, would cause him great pain and suffering?

"*A.* Why, I kicked him any place it happened, so long as he was abusing me, in self-defense.

"*Q.* So when he took you by the wrists he would hold you out at arms length?

"*A.* I don't remember. He might have. * * *

"*Q.* So the only complaint you could have had was because he didn't tell you about the property, isn't that so?

"*A.* Well, I didn't like him to slap me all the time.

"*Q.* Well, you never spoke to anybody about it?

"*A.* I considered it serious enough to keep it to myself.

"*Q.* But that isn't so serious in your mind as the fact he didn't let you know about his business?

"*A.* I considered that was quite serious.

"*Q.* Not so serious as the curiosity about his property, in other words you were speaking to him more about the property than you were about him slapping you?

"*A.* Yes, because I didn't care to keep that in mind, about the slapping.

"*Q.* The more important part was about the property and not the fact he slapped you, isn't that so?

"*A.* I don't know that I made any complaint.

"*Q.* Well, I mean in your own mind, your attitude would be governed when you tried to determine the relative importance of these matters, you think his secrecy about his property was most that caused you more pain and suffering than the matter of striking you?

"*A.* I thought enough of Roy that I felt I would like to have him treat me as a companion and I felt that he would consider that I should be interested.

"*Q.* So I say the important thing in your mind was the secrecy he maintained, that is the most important thing?

"*A.* Yes.

"*Q.* And not of striking you, that was incidental?

"*A.* Well, I considered that was quite serious; I wouldn't care to have it happen any more."

At the hearing, two years after separation, it appeared that defendant had meantime occupied the home and had received her support from plaintiff. She testified:

"*Q.* How did you feel when Roy left, were you disconcerted and unhappy?

"*A.* I felt very badly.

"*Q.* Were you unhappy?

"*A.* Yes, indeed.

"*Q.* Did you tell any one you were dissatisfied or unhappy, you hoped he would come back?

"*A.* Yes, a good many times.

"*Q.* Who did you tell?

"*A.* I have told Mrs. Jones and I have told my sister Mrs. Degner right here. I have said if Roy wants to stay away and he supports us, all right I will make the best of it; I can get along all right. I have never said I didn't want him, I said if he really prefers to be away from me it is all right, if he just gives me the money.

"*Q.* And you would be perfectly satisfied?

"*A.* I am not perfectly satisfied, no indeed.

"*Q.* Well, you haven't been perfectly satisfied during your marriage relations any time?

"*A.* Why yes I have if Roy had been kind to me I would have been."

The testimony of other witnesses, if true, shows her present attitude to be one of satisfaction so long as she is supported by her husband. That she visited her husband's place of business and there publicly entered upon wordy controversies with him is established.

Plaintiff testified that he never had slapped defendant, although he admits having threatened to do so.

The weight of evidence is, I think, the other way and requires the finding that he has in moments of exasperation slapped her face. That defendant feared him is not true. Her attack upon him while he was dressing upon the morning when he finally left home, when she took him by the ears and shook his head, is evidence of this.

The testimony tends to prove, and requires the finding, that defendant used in talking to her husband language not generally regarded as proper for either man or woman to use, in speaking of plaintiff's father.

A witness for defendant, her brother, whose testimony impresses me as that of an observing man, gave the following testimony:

"*Q.* Now, as a matter of fact, Mr. Melling, Mr. Northrup came to you at various times and told you Mrs. Northrup and he were having troubles and she was nagging him, he counseled with you in regard to what to do?

"*A.* He told me at various times they were having trouble and she was nagging at him and would keep at him and jaw at him and he couldn't go to sleep.

"*Q.* And put it up to you what he could do, how he could get over it?

"*A.* No, I can't say he did. I did go to Mrs. Northrup and talk to her about these things, about their troubles, and try to have her stop it, and told her they should not occur any more. I told Roy the same thing, but he didn't ask me for it. As near as I can recall, the occasion I told her I was sorry they couldn't get along a little better, that I had talked to Roy and I wanted to have a little talk with her and see if there wasn't some way they could get together, compromise and live together without quarreling and scrapping all the time.

"*Q.* It was your desire, as well as Roy Northrup's desire, to get along without scrapping?

"*A.* That was my desire.

"*Q.* Didn't Mr. Northrup tell you he didn't like to live that way; he didn't like to have quarreling in his house?

"*A.* He did tell me he didn't like it.

"*Q.* He didn't enjoy this life he was living?

"*A.* I don't see how he could.

"*Q.* As a matter of fact, wasn't he down-hearted and down-spirited all the time and dejected over the quarrels he was having?

"*A.* Apparently so.

"*Q.* Very much troubled and nervous, he couldn't stand it; it bothered him in his work and his bookkeeping and work at his office?

"*A.* I don't know to what extreme it affected him.

"*Q.* Wasn't he—wasn't it noticeable when he was having these troubles; he was nervous, very moody and quiet?

"*A.* He was.

"*Q.* Brooding over them apparently?

"*A.* I would say so.

"*Q.* Now, when you went to Mrs. Northrup and told her about these things, did you tell her to cut out the nagging, to get along without it and live without these quarrels?

"*A.* No, I told her—as a matter of fact, I told her as I had sized the situation up, from what I had seen and heard, that one was to blame as much as the other, and if each one of them did their part I thought they could live together just the same as any other family was living.

"It seemed to me that they were both in trouble, and each one would have to do their end if they ever came together. The way I expressed it to her was that she must come half way and he should come the other half; that there were no two persons alike, and they would have to both compromise; perhaps there were things he did that she didn't like and there were things that she did that he didn't like, but they would have each to overlook a certain amount of it and try to get together.

"*Q.* Do you know, Mr. Melling, as a matter of fact, do you know what the disputes were over, how they arose or what they were over?

"*A.* Well, I don't know very much about that, but it always occurred to me that a great deal of it was on account of Roy working so much.

"*Q.* He was working too long hours to be really a home man?

"*A.* That is the idea exactly. He was home, but he was confined to his office, and the way it always occurred to me, that he was too busy ever to sit down and visit or take a walk and go and visit somebody else; he was confined right there, and he just came home and got his meals and did his work and went to bed.

"*Q.* In other words, he wasn't a social enough being?

"*A.* No, he didn't spend enough time with his family, in my opinion.

"*Q.* He was a worker?

"*A.* Absolutely.

"*Q.* Well, now, coming back again, you have heard these little disputes—little words, as you call them?

"*A.* Very few of them.

"*Q.* When you heard them what do you find they were quarreling about, having words over, what was the real foundation of them?

"*A.* As a matter of fact, I don't think there was very much foundation to any of them.

"It looked to me as though they were disagreeable. It looked to me as though neither one of them had to do or say very much to start something. Mrs. Northrup is a woman who can sit down and argue a subject without getting angry, but I don't know whether she can with Roy, I couldn't say.

"*Q.* You don't know, Mr. Melling, at any time, of your own knowledge, of any time that Roy Northrup ever abused or mistreated Mrs. Northrup, of your own knowledge?

"*A.* I never saw anything of the kind?"

This witness knew little of the home life of the parties from observing it, and the advice he gave would undoubtedly be valuable in most cases of domestic infelicity. I am impressed, however, that here the situation is a more serious one. The nature of a man's domestic troubles, or of a woman's domestic troubles, may be evidenced by its effects. Men like the plaintiff do not work hard for ten years or more to get and maintain a home and acquire a competence and then sacrifice home, family and business as plaintiff has done for a whim or out of spite or revenge merely.

There is a driving, compelling cause for such action. And when the cause is, admittedly, domestic trouble, the action is evidence of desperation, lost hope, insupportable conditions.

I should have been more sure of my conclusions if I had seen the parties, and other witnesses, as the trial judge did. Upon this record, I am compelled to disagree with his conclusion and to hold that plaintiff has made out a case of extreme cruelty practiced by defendant. It may be true, as the court below found, that the burden incident to caring for the child has done much to make defendant irritable. It does not excuse the conduct of defendant who has, I believe, no affection for plaintiff and no purpose to assist in rebuilding and carrying on, if it were possible, a pleasant or peaceful home. It is not possible, I think, for them to live together.

The decree must be reversed and one entered divorcing the parties. The custody of the child should be given the mother, presently at any rate. The record does not permit us to fix the alimony, if any ought to be allowed. The defendant is at liberty to apply to the court below for permanent and temporary alimony.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.